# CITY OF SANFORD, FLA., v. CHASE NAT. BANK OF CITY OF NEW YORK.

District Court, S. D. New York.
Aug. 15, 1930.

Charles A. Boston, of New York City (Charles A. Boston, of New York City, George A. De Cottes, of Sanford, Fla., Lucien H. Boggs, of Jacksonville, Fla., and James H. Caldwell, of New York City, of counsel), for plaintiff.

Rushmore, Bisbee & Stern, of New York City (Harold G. Pickering and Bertram F. Shipman, both of New York City, of counsel), for defendant.

KNOX, District Judge.

Suit is here brought to restrain the defendant from selling or otherwise disposing of certain negotiable bonds of the city of Sanford, Fla., of the par value of $740,000, which came into possession of defendant as a

result of a complicated series of transactions carried on between the parties in suit, the Seminole County Bank of Sanford (now in liquidation after failure), and Forrest Lake, president of the latter institution, and also mayor of the city of Sanford. Plaintiff further seeks the surrender and cancellation of three certificates of indebtedness of the city of Sanford, originally drawn in the aggregate sum of $600,000, but which, through payment of $100,000, have been reduced to the principal sum of $500,000. These certificates, it is urged by plaintiff, were issued by the mayor and city clerk of plaintiff, and negotiated by the mayor without proper authority, and without consideration therefor passing to plaintiff. All of the securities mentioned are held by defendant under a claim that they are collateral to an indebtedness of the plaintiff to the Chase Bank in the sum of $500,000.

In reality, the suit is a reverberating echo of the collapse of the Florida boom. In order to understand the entire situation, a long recital is required.

Plaintiff is a municipal corporation, operating under a commission form of government. The commission consists of three members, who are vested, so far as the issues here involved are concerned, with the legislative and executive powers of the municipality. The chairman of the commission enjoys the title of mayor of the city, but in the latter capacity, the person holding the office is authorized to exercise few, if any, powers of an independent character. The members of the commission, under the provisions of section 57 of the City Charter, also function as bond trustees, and as such have charge of the issuance, advertising, and sale of bonds of the city, and the disposition of their proceeds. Two of such trustees constitute a quorum of the board. In addition to the officers to whom reference has been made, two other officials of the city play a part in the matters out of which these suits arise. They are the city attorney and the city clerk. The Charter of Sanford, in section 34, says:

"The City Commission shall appoint a City Attorney who shall act as legal adviser to the municipality and its officers in matters relating to their official duties. Upon request, he shall furnish the City Commissioner, the City Manager, or head of any department, his opinion on any question of law relating to their respective duties, provided that he shall not be required to give his opinion to any subordinate thereof, and perform such other duties as the City Commission may require."

Section 36 of the Charter creates the office of city clerk and defines his duties. He is appointed and serves at the pleasure of the city commission. The section provides that:

"He shall issue all warrants for the payment of money by the City; he shall keep an accurate account of all taxes and assessments of all moneys due to, and all receipts and disbursements by, the municipality, and shall submit to the City Commission, at the first meeting in each month, a complete report covering the receipts and expenditures of the preceding month, showing the financial condition of the city. He shall furnish such reports and data as may be necessary to fully inform the City Commission as to the municipal affairs of the City, and such estimates of expenses of the City Government as may be required to form a basis for the annual budget to determine the revenues necessary to be raised each year. * * * "

Section 22 of the Charter states that every ordinance or resolution of the commission shall be authenticated by its presiding officer and the clerk.

Over most of the period with which the suit deals, and up until August 6, 1927, the officials in office, in addition to Forrest Lake, were: S. O. Chase and E. F. Householder, city commissioners and ex officio members of the board of bond trustees. Subsequent to August 6, 1927, when Lake resigned, Householder was mayor of the city. The city attorney was George A. De Cottes, and the city clerk was L. R. Phillips.

During the heyday of land development in Florida, the city of Sanford was not without its natural desire to become a more metropolitan community, and vigorous steps looking to that end were undertaken. What was done, and what was attempted, necessitated the expenditure of considerable sums of money. As mayor of the city, and as president of the Seminole County Bank, Forrest Lake, as readily may be understood, took a prominent part in financing the monetary requirements of Sanford in carrying out its plans of development. In fact, he seems to have exercised power in the premises that was little less than plenary, his fellow officials not concerning themselves with the details of what he did, so long as the money continued to flow into the improvements to which the city had committed itself, and which were in contemplation. When, however, the Seminole County Bank suspended business with credits, upon its books in favor of the city which could not be translated in cash, the acts

of Lake, as fiscal agent for the city, were more closely scrutinized, and this litigation is one of the results of the matters then ascertained.

For the purpose of giving effect to whatever bearing the financial resources of Sanford, and those of the Seminole County Bank, may have upon the present situation, it may be well to say that the plaintiff is a town of between 10,000 and 15,000 inhabitants. The Seminole County Bank has a capital of $100,-000 and a surplus of $25,000. Its deposits ranged from $1,225,000 to $2,000,000. The aggregate of its assets and liabilities was never in excess of $3,000,000. It had been in existence for a number of years, and had, as its New York correspondent, the Chase National Bank, now known by the name shown in the caption, and which will hereinafter be designated as the "Chase Bank." On March 24, 1921, the Seminole County Bank agreed that all moneys, securities, deposits, etc., that it might at any time have deposited or lodged with the Chase Bank, should be regarded and held as collateral security for any indebtedness which it might owe to that institution.

Once the city had launched its improvement program, and the issuance of bonds had been authorized by the electors, it was desired to get the work in contemplation under way at the earliest possible moment. The sale of bonds, even though authorized, would consume some time. In order to obviate this delay, and to be possessed of funds at an earlier date than the sale of bonds in regular course would permit, the city commission inaugurated a policy of temporary financing, as is evidenced by the following document, which came into being on August 5, 1925, with the approval of all the then members of the city commission:

"Whereas certain improvements are being made in the City of Sanford, Florida, the cost of which is to be defrayed by the issuance of bonds, the City's proportion of said improvements to cost approximately $300,-000.00, and

"Whereas contracts have been and are being let for said work, and

"Whereas the proceeds derived from the sale of bonds to pay the cost of said improvements will not be available, until several months later, and

"Whereas it is necessary for the City of Sanford, Florida, to temporarily finance the cost of the proportion of said improvements to be paid for by the City, therefore,

"Be It Resolved that the Mayor and City Clerk of the City of Sanford, Florida, be and they are hereby authorized from time to time, as required, to issue interest bearing time warrants of the City of Sanford, Florida, and to negotiate the sale of said time warrants hereby authorized to be so issued, not to exceed the sum of $300,000.00, to bear interest at the rate of eight per cent per annum until paid, interest payable quarterly, all of said time warrants to be hereafter funded and paid by the City of Sanford, Florida, from the proceeds derived from the sale of the bonds of the City of Sanford, Florida, or with other funds of the City of Sanford, Florida, derived through taxation or other sources."

Thereafter, on February 8, 1926, it having been determined that the city's proportion of the improvements would exceed the sum of $450,000, the mayor and city clerk were authorized to issue further "interest bearing time warrants of the City of Sanford, Florida, and to negotiate the sale of said time warrants hereby authorized to be issued, not to exceed the sum of $450,000. * * * "

Thereafter, numerous certificates of indebtedness, in varying amounts, and payable to Chase Bank, came into the hands of that institution, and were discounted by it. In each instance, the instrument was forwarded by Seminole County Bank, accompanied by a letter, to the effect that upon the maturity of the certificate, the same might be charged against the account of the Seminole. In each instance, also, the Chase Bank credited the proceeds of the discounted certificate to the account of the Seminole County Bank. So far as appears, the city of Sanford received the avails of each of these certificates through the Seminole County Bank. The last of this series of certificates was paid on October 22, 1926.

During the period from 1924 to 1926, the plaintiff made several issues of its bonds. In handling the disposition of the bonds, it was customary, once the issue had been authorized, to print the bonds and to deliver them to Lake at the Seminole County Bank for signature by himself and the city clerk. They would then be validated by the clerk of the county court, and returned to Lake to await their sale. He, in turn, would forward the bonds to the Chase Bank, to be held by it pending sale. When this had been brought about, the proceeds would be deposited in the Chase Bank to the credit of the Seminole County Bank, and outstanding certificates of the city would be charged against it. Any balance remaining would ordinarily find its way to the city through the Seminole. At this point, it should again be observed that

each of the certificates, so far mentioned, was payable to the defendant.

In October, 1926, the series of events involved in these lawsuits began. Aside from the matters of inducement, if they may so be described, which heretofore have been set forth, these events are the following:

Prior to October 11, 1926, the plaintiff had taken steps which resulted in the authorization of four bond issues, to wit:

Municipal fire station bonds, to the amount of $150,000, series "L. L."

Police electric alarm system bonds to the amount of $40,000, series "M. M."

Wharf and dock improvement bonds to the amount of $400,000, series "N. N."

Bulkhead improvement bonds to the amount of $400,000, series "O. O."

These bonds, each of the denomination of $1,000, following the usual practice, were delivered to Lake. Although no proceedings looking to the sale of the securities had yet been instituted, Lake procured the execution of the bonds to be carried out by the city clerk and the clerk of the circuit court. When this had been done, Lake forwarded the bonds to defendant with a letter requesting that they be held until further instructions were given. Defendant acknowledged receipt of the securities to Lake, as president of the Seminole County Bank, saying, they would be held "in special deposit for your account." There were two of these letters, dated October 21 and October 22, 1926, respectively.

On November 8, 1926, the Seminole County Bank executed its promissory collateral note to the Chase National in the sum of $300,000. It was to fall due on February 7, 1927. Payment of the note was personally guaranteed by Lake. Accompanying the note, and recited in its terms, was a certificate of indebtedness of the plaintiff in the sum of $300,000, bearing even date with the note, and being due on February 8, 1927. This instrument, bearing interest at the rate of 6 per cent. per annum, payable quarterly, was drawn in favor of Seminole County Bank, and had been executed in the name of the city by Lake, as mayor, and L. R. Phillips, the city clerk. It also bore the seal of the city.

Knowledge of the existence of this document, prior to July, 1927, is denied by City Commissioners Chase and Householder. It appears, however, that at Sanford, Fla., on or about November 8, 1926, Lake got into communication with City Attorney De Cot-

tes by telephone and asked him to stop in at the Seminole County Bank. De Cottes complied with the request, and was then told by Lake that advances then made, and immediately to be made by the Seminole County Bank, aggregated the sum of $300,000, for which the bank held the certificates of indebtedness. He further stated that the financing of this amount had presented a serious problem, and that, if a bank examiner should put in an appearance and find the bank holding city paper in such a large sum, without something to support it in the way of legal data, he might make objections thereto. For this reason, he asked De Cottes, as city attorney, to give an opinion as to the legal sufficiency and validity of the certificate. What then took place is described by De Cottes in these words:

"I said to Mr. Lake * * * that there had been certain financing resolutions adopted by the city, but as to the particulars thereof I had no recollection. * * * Mr. Lake said that there had been a fairly recent resolution of that kind adopted. I asked the date thereof; he could not recall but said, 'I will satisfy you as to that * * * I will call Dr. Phillips' (The City Clerk) Lake then talked to the office of the clerk, and after an interval, Dr. Phillips came into the bank and handed to Mr. Lake a certified copy of the resolution of February 8, 1926. * * * I read over the resolution, I asked Mr. Lake then the specific questions as to any financing or advancing of money under the authority of the resolution. * * * Mr. Lake stated * * * that there had been no advance of funds to the City in any amount whatsoever under said resolution and that the $300,-000, evidenced by the certificate * * * which he exhibited * * * was the only advance * * * made by him, by the Seminole County Bank or otherwise to the City of Sanford, Florida. * * * Thereupon, having no reason * * * to doubt the honesty and integrity of Mr. Lake, or his veracity * * * I gave him and signed as City Attorney, the letter of November 8, 1926. * * *"

The letter is to the effect that the certificates of indebtedness constituted a properly executed and binding obligation of the city, payable out of the proceeds of the bond issues, aggregating $990,000, that had then been authorized, and which have heretofore been identified.

De Cottes does not recall that Lake told him the certificate was to be used by the Seminole in obtaining funds from the defendant,

but the cashier of the Seminole, who was present at the interview, thinks De Cottes was so informed. In passing, it may be remarked that neither litigant called Lake as a witness, notwithstanding his intimate knowledge of all that took place. It would appear that each was afraid of what he might say.

But, however this may be, the fact is that on November 8, 1926, the Seminole County Bank forwarded the note above mentioned, together with the certificate of indebtedness and the opinion of De Cottes, to the Chase National. These were accompanied by a letter from the cashier of the Seminole in which he said:

"This is to advise that the $990,000 City of Sanford 5½% bonds which you now hold, will not be withdrawn from your good institution until the Certificates of Indebtedness of $300,000, dated November 8, 1926, of the City of Sanford has been paid."

Upon receipt of these documents, on November 10, 1926, the Chase Bank credited the Seminole's account with $300,000, less interest to maturity on the certificate and note. As of November 9, 1926, the Seminole County Bank gave credit on its books to a savings account of the bond trustees of the city of Sanford in the sum of $300,000. The transaction was recorded on the books of the bond trustees of the city, and it was also noted on the books of the city clerk.

The note, not being paid at maturity, was renewed from time to time until June, 1927, when, a portion of the aforementioned bonds having been sold, and the proceeds deposited in the Chase to the credit of the Seminole, the sum of $100,000 was charged against the same and credited as a payment on the note.

Meanwhile, Lake had called at the defendant bank on December 30, 1926. He then arranged for an additional advance of $300,-000 against the sale of the bonds already on deposit with the Chase, and against an issue of hospital bonds which recently had been authorized by the city, and which it was contemplated would be handled in the same manner as prior issues. The defendant being agreeable to the suggestion of Lake, he delivered to the defendant two notes of the Seminole County Bank, one in the sum of $100,000 and the other in the sum of $200,-000, both bearing date of December 27, 1926. He also delivered to the defendant two certificates of indebtedness of the city of Sanford, both dated December 27, 1926, and corresponding in amounts with the notes of the Seminole County Bank. The certificates were due March 27, 1927. At the same time, Lake gave the Chase Bank a letter which was signed by him, both as president of Seminole County Bank and as mayor of Sanford, in which he said:

"Please discount the two notes amounting to $300,000., and credit our account with the proceeds. In consideration of your doing so, I agree, both as President of the Seminole County Bank of Sanford and as Mayor of the City of Sanford, which you now hold in special deposit for the account of the Seminole County Bank, will not be withdrawn until the indebtedness of the Seminole County Bank to the Chase National Bank has been paid. These bonds amount to $990,000.

"I also agree, as Mayor of Sanford, that I will advertise the bonds for sale on or before February 1, 1927. I also agree, as soon as the bonds have been advertised, to furnish you with legal opinion of a satisfactory New York attorney, as to the legality, genuineness and sufficiency of the bonds. I also agree with you, as Mayor of the City of Sanford, that I will do everything that I can to bring about the sale of these bonds at the earliest possible moment, so that the proceeds thereof will place the Seminole County Bank in funds to retire its indebtedness to you.

"Upon my return, I will have sent to you as soon as executed $250,000, additional bonds of the City of Sanford, which will also be held by you for account of the Seminole County Bank of Sanford, and these bonds, like the other bonds above mentioned, will be left with you until the entire indebtedness of the Seminole County Bank has been paid."

Upon delivery of these papers, defendant credited the account of Seminole County Bank with $300,000, less interest to maturity on the two notes and their accompanying certificates. On January 2, 1927, Seminole County Bank credited the savings account of the bond trustees of the city of Sanford with $300,000.

The transaction was entered on the books of the bond trustees of Sanford and upon the journal of the city clerk.

Neither of the notes was paid at maturity and were the subject of several renewals. When last renewed, the obligations were consolidated into one for $300,000 and payment extended. The certificates of indebtedness were continued as collateral security therefor. Early in 1927, the Chase Bank began to make inquiry as to when the notes held by it would be discharged. On February 5, Lake wrote that within a short time the hospital bonds, then in process of validation, together with the bonds already in possession of defendant,

would be sold, at which time "we will then liquidate our entire indebtedness with your good bank."

A month later he assured defendant that efforts were being made to dispose of the bonds in April. A few weeks thereafter he stated:

"The bonds which you now hold as collateral to the certificates of indebtedness, will be sold as soon as the hospital bonds of $250,000, are ready for delivery, and the certificates retired in full."

Matters ran along until June 18, 1927, when the Seminole County Bank sent the hospital bonds of $250,000 to the defendant with instructions to place them with those already held. The defendant was informed that Lake was leaving for New York to close negotiations for the sale, and that he would give instructions relative to the delivery of the bonds to the purchaser.

Bids for the purchase of the bonds were received, but, being unsatisfactory, were rejected. Under a permissive statute of Florida, a private bid for the sale of $400,000, bulkhead, and $100,000 fire station bonds, was then accepted, the sale being consummated through the Chase Bank on June 27, at the direction of Lake and De Cottes, both of whom were then in New York. A letter, signed by De Cottes, as city attorney, was delivered to defendant, which read as follows:

"Upon payment of the face of the draft (in payment of the bonds), together with accrued interest from January 1, 1927, to date of actual delivery, please credit funds received by you to the account of the Seminole County Bank, Sanford, Florida, advising thereof by wire."

At the foot of the communication, this notation appeared:

"Please comply with the foregoing instructions

"Seminole County Bank
"Sanford, Florida,
"By Forrest Lake,
"President"

Three days thereafter, under instructions from Lake, defendant charged the account of Seminole County Bank with the sum of $100,000, as previously recited, and credited the same on the notes and the certificates of indebtedness. The Seminole County Bank, under date of June 25, 1927, debited the savings account of the bond trustees of Sanford with a like sum, and the city clerk drew a voucher on the bond trustees for $100,000, which contains this recital:

"Payment on $300,000, certificate of indebtedness to Seminole County Bank, Sanford, Fla. dated November 8, 1927. Paid as of Jun. 25, 1927, $100,000."

The voucher was signed by Lake as mayor of Sanford and countersigned by him on behalf of the bond trustees. It is without the signature of either of the two other trustees. Nevertheless, an entry of the payment was posted on the ledger of the city by the clerk having custody of the same.

Some further effort in the way of disposing of the city bonds, which remained in possession of defendant, was made by Lake, but it was unsuccessful, and August 6, 1927, the Seminole County Bank went to the wall. Then it was that the commissioners and bond trustees of the city of Sanford, other than Lake, began to take a more lively interest in the financial affairs of the city than they had theretofore exhibited. Until this development, they seem to have been content to stand by and allow Lake to handle the finances of the city in the way that appealed to him as being most appropriate. The matters which now came to their attention, if they had not previously known them, led to a visit of the city attorney to New York, at which time he made demand upon the defendant for the return of the bonds to the city. The demand being refused, the instant suit was thereafter begun.

■■ Whatever may be said of the validity or invalidity of the certificates of indebtedness, and the liability of the city therein, one feature of the case, in my opinion, is reasonably clear. It is that the defendant is not entitled to hold the bonds in its hands as collateral security for the performance of any obligation the city may be under to pay the balance of the sum represented by the certificates. I say this for the reason that the record before me shows no authorization to Lake or any one else, on behalf of the city, which would or could justify the pledge of unsold bonds as security for the payment of a debt of Seminole County Bank. When all inferences favorable to the defendant are drawn from what was done by the city, and by Lake, with respect to financing the needs of the municipality, the truth is that there is not a semblance of authority for jeopardizing the bonds in the event that default should be made by the city of Sanford in the payment of the certificates of indebtedness. Until full compliance with every statutory requirement of the state of Florida, relating to the issuance of the bonds by the city of Sanford had been had, the bonds now in the possession

of the defendant can have no valid existence as outstanding obligations of the city.

Section 123(E) of the City Charter provides:

"Any and all negotiable bonds issued under any of the provisions of this Act shall be advertised for sale on sealed bids, which advertisement shall be published. * * * If any such bonds be not sold pursuant to such advertisement, they may be sold at private sale at any time within sixty days after the date advertised for the reception of sealed bids; except as otherwise herein provided, no bonds issued under any provisions of this Act shall be sold for less than par with accrued interest."

■ The bonds came to defendant with full knowledge on its part that they had never been advertised and sold in the manner prescribed by law. Prior to a complete compliance with statutory requirements having to do with the issuance of the bonds, the Chase Bank had no right to accept them as collateral for any debt of the city, or of the Seminole County Bank. It knew, or should have known, that neither Lake nor his bank had title to nor lien upon the bonds, and neither was in position to pledge them as collateral security for the repayment of the note of Seminole County Bank. Nor could the city pledge the bonds as security for the payment of another debt of its own, and which was not represented by the bonds themselves. See Barnett v. City of Denison, 145 U. S. 135, 12 S. Ct. 819, 36 L. Ed. 652; Merrill v. Town of Monticello, 138 U. S. 673, 11 S. Ct. 441, 34 L. Ed. 1069. Defendant's argument that the provision of Sanford's charter, last above quoted, is not applicable to the case inasmuch as it claims only a lien as pledgee for advances made against sales, is, I believe, wholly unsound. In making the contention, defendant confuses its rights as against plaintiff's, with such as it would have had if an individual had enabled Lake's bank to pledge his property for a debt of the bank. See McNeil v. Tenth National Bank, 46 N. Y. 325, 7 Am. Rep. 341. Admission is made, of course, that in no event can defendant recover from the bonds any more than the amount of its debt. But what if the entire lot of bonds, amounting to $740,000 par value, should, upon a sale by the bank, not bring more than $500,000, the principal amount of the debt here claimed? Obviously, there could be no compliance with the provisions of the city charter that bonds of the municipality must bring par and interest.

■ Furthermore, the defendant has no right to advertise the bonds on behalf of the city. That right resides exclusively in the city and it is to be exercised at such time as the proper authorities of the municipality see fit. There is nothing here which gives either the defendant or the court the privilege of coercing the city in the matter. Whatever may be said of the authority of the city to issue certificates of indebtedness, and of the similarity between such obligations, and those which take the ordinary form of municipal bonds, it will not do, I think, to say that the power to put out certificates includes that which will enable the city to pledge evidences of debt, which come into being for a specific purpose, as security for a certificate of indebtedness, the proceeds of which might have been used, for all that is here shown, for general municipal purposes. To hold as the Chase Bank requests might conceivably frustrate the object intended to be secured by bond issues, which were and are intended to achieve specific purposes of the voters of the city of Sanford. The resolution which the defendant relies upon contemplated that the certificates therein mentioned might be paid from sources other than the proceeds of the bond issues then contemplated. It is therefore inferable that the proceeds of the certificates might have been used for the general purposes of the city, or indiscriminately between the various projects then under way.

■ Defendant, taking its case at the best, was dealing with the obligation of a municipality, and it was charged with the duty of being extremely circumspect in parting with money on the faith thereof. In other words, under the circumstances here present, it was under the duty of inquiring into the extent of the power of the city authorities in handling its evidence of debt. So far as the bonds are concerned, I think the position of the defendant is without the slightest support, and it will be required to deliver them to the plaintiff.

### The Certificates of Indebtedness.

■■ This disposition of this branch of the case is not so simple as that which deals with the bond controversy. It is, nevertheless, my conclusion that beyond the sum of $450,000 and interest thereon, the defendant has no rights which may here successfully be asserted against the city. This is for the reason that there was no apparent authority in existence which would warrant the issue of certificates of indebtedness in excess of $450,000. The defendant, I think, whatever else may be said of its equities, should be bound by that limitation. See Merrill v. Town of Monticel-

lo, supra, and Brenham v. German-American Bank, 144 U. S. 173, 12 S. Ct. 559, 36 L. Ed. 390. Aside from this, however, the city should be held to be estopped from interposing a defense to the certificates held by defendant. By its own acts, both definite and unequivocal, it gave defendant reason to believe that the mayor and city clerk, under authority of the bond trustees, were empowered to issue binding certificates of indebtedness for and on behalf of the municipality. Numerous instruments of a character substantially similar in form and substance to those now before the court, and payable to defendant, had come into the hands of the latter.

Upon the faith and credit of the same, thousands upon thousands of dollars had been passed to the credit of Seminole County Bank, and through it to the uses and purposes of the plaintiff. Time and again the defendant had deducted the amounts payable on such certificates from the proceeds of bond sales handled through the Chase Bank, and the city acquiesced in and consented to such course of procedure. The present instruments, aside from the name of the payee therein named, are precisely similar to those which preceded them, and which were recognized as the evidences of valid debts of the city. Vouchers made and used by officers of the city, in addition to the mayor and city clerk, were utilized in clearing the payments of the certificates on the books of the Seminole County Bank, the bond trustees, and the city clerk. Repeatedly, the authority of Seminole County Bank to act upon behalf of the city was recognized by substantially every authority of the city administration. Indeed, the very transactions with which the court now deals were entered upon the books of the city, and had the commissioners, other than Lake, not delegated to Lake and Phillips the entire responsibility of handling the finances of the city, and had they not been content to ratify everything that he and Phillips did in prior transactions, any question relating to the advances made by defendant might have been avoided.

Not only all of the foregoing tended to induce the bank to rely upon the certificates for what they purported to be, but the city attorney himself gave a written opinion as to the validity of the first certificate for $300,-000, which was payable to Seminole County Bank, and which was used as collateral to the loan for that amount advanced to Lake's institution by the Chase National. The testimony of Mr. Cottes that he did not specifically know that the certificate was to come into the hands of defendant may be accepted. He did know, however, that his opinion was designed to put at rest any doubt that might arise in the mind of a bank examiner who, in going over the assets of the Seminole County Bank, as to the validity of the certificates. If, as a matter of fact, the certificate be valid as a proper exercise of power under the resolution of the commissioners, and was so regarded by Cottes, there was no reason why it should not be utilized by Seminole County Bank as security for a loan from the Chase National, and thus be of aid in solving the problem that then confronted the Florida institution in financing the needs of Sanford. The defendant, therefore, was quite as much justified in relying on De Cottes' opinion as would have been the bank examiner to whom the opinion was, or might have been, shown. This word of De Cottes, as the city attorney of Sanford, confirmed the regularity not only of this transaction, but also gave defendant some reason to believe that the following certificates negotiated by Lake were also binding obligations of the plaintiff, if they turned out to be within the authority granted by the bond trustees. In addition, the certificates contained the representation that:

" * * * All acts, conditions and things required by law to exist, happen and be performed precedent to and in the issuance of this bond, have existed, have happened, and have been performed in regular and due time, form and manner, as required by law, by the City Commission of the City of Sanford, Florida, for the payment of the principal sum represented by this certificate of indebtedness, together with all accrued interest thereon."

In the face of this certification, and of all that went before, it was most unjust that defendant, which in good faith advanced money to the Seminole County Bank, and which was credited to the plaintiff on the books of that institution, and upon the books of the city itself, should lose well on to a half million dollars, merely because the bank to which the city intrusted its funds is now unable to pay its debts in full.

For the reason assigned, except to the extent of $50,000, I shall decline to decree the cancellation of either of the certificates of indebtedness, and to direct their surrender. Believing as I do that the city should recognize and pay the certificates to the extent of $450,-000 and interest, the decree to be entered hereon may provide for that relief to the defendant.